739 F.2d 48
 18 Ed. Law Rep. 848
 Betty-Louise FELTON, Charlotte Green, Barbara Hruska, Meryl
A. Schwartz, Robert H. Side and Allen H. Zelon,
Plaintiffs-Appellants,
v.
SECRETARY, UNITED STATES DEPARTMENT OF EDUCATION, and the
Chancellor of the Board of Education of the City
of New York, Defendants-Appellees,
and
Yolanda Aguilar, Lillian Colon, Miriam Martinez and Belinda
Williams, Intervenor-Defendants-Appellees.
 No. 964, Docket 83-6359.
 United States Court of Appeals,
Second Circuit.
 Argued April 4, 1984.
Decided July 9, 1984.
 
 Stanley Geller, New York City, for plaintiffs-appellants.
 Michael Jay Singer, U.S. Dept. of Justice, Washington, D.C., for defendant-appellee Secretary of Education.
 Lorna B. Goodman, Asst. Corporation Counsel, New York City (Frederick A.O. Schwarz, Jr., Corporation Counsel, and Leonard Koerner and Michael Gage, New York City), for defendant-appellee Chancellor.
 John J. Buckley, Jr., Charles H. Wilson, Paul Mogin, Washington, D.C. (Williams & Connolly, Washington, D.C.), Joseph C. Markowitz, New York City (Parker, Auspitz, Neesemann & Delehanty, New York City), for intervenor-defendants.
 Before FEINBERG, Chief Judge, and FRIENDLY and OAKES, Circuit Judges.
 FRIENDLY, Circuit Judge:
 
 
 1
 The venerated language of the First Amendment provides that
 
 
 2
 Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof ....
 
 
 3
 Title I of the Elementary and Secondary Education Act of 1965 ("the Act"), 20 U.S.C. Sec. 2701 et seq.,[1] declared it to be the policy of the United States to provide financial assistance to local educational institutions serving areas with concentrations of children from low-income families to expand and improve their educational programs which contribute particularly to meeting the special educational needs of educationally deprived children, and authorized the Commissioner, now the Secretary, of Education to make payments to State educational agencies for grants made on the basis of entitlements created by the statute. Since 1966 New York City ("the City") has been receiving federal funds to finance programs wherein it sends public school teachers and other professionals into religious and other nonpublic schools to provide remedial instruction and clinical and guidance services to students meeting the standards of the Act and the Secretary's regulations thereunder. The question is whether the Establishment Clause permits this.
 
 
 4
 We have no doubt that the program here under scrutiny has done much good and that, apart from the Establishment Clause, the City could reasonably have regarded it as the most effective way to carry out the purposes of the Act. We likewise have no doubt that the City has made sincere and largely successful efforts to prevent the public school teachers and other professionals whom it sends into religious schools from giving sectarian instruction or otherwise fostering religion. However, we hold that the Establishment Clause, as it has been interpreted by the Supreme Court in Public Funds for Public Schools v. Marburger, 358 F.Supp. 29 (D.N.J.1973), aff'd mem., 417 U.S. 961, 94 S.Ct. 3163, 41 L.Ed.2d 1134 (1974); Meek v. Pittenger, 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975) (particularly Part V, pp. 367-72); and Wolman v. Walter, 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977), constitutes an insurmountable barrier to the use of federal funds to send public school teachers and other professionals into religious schools to carry on instruction, remedial or otherwise, or to provide clinical and guidance services of the sort at issue here. A more elaborate statement of the facts follows.
 
 
 5
 The Facts and the Proceedings in the District Courts
 
 
 6
 The Act provides for annual Congressional appropriations for programs proposed by local educational agencies ("LEAs") and approved by state education agencies ("SEAs"), 20 U.S.C. Sec. 2731. All programs are administered solely by the LEA in the particular area and are staffed entirely with the LEA's employees. 20 U.S.C. Sec. 2734(m); 45 C.F.R. Secs. 116.42, 116a.23(f). To be eligible for Title I funds, a program must satisfy certain statutory criteria that are designed to assure that the Act's purposes are advanced. For example, Title I funds may be provided only to children who meet the dual eligibility requirement of (1) educational deprivation, defined as below age-level performance, and (2) residence in an area designated by the LEA, in accordance with Title I regulations, as having a high concentration of children from low-income families. 20 U.S.C. Secs. 2722, 2732-34. Federal financing is available only for programs that will supplement, rather than supplant, non-federally funded programs that would have been available in the absence of Title I funds. 20 U.S.C. Secs. 2734(f), 2736(c).
 
 20 U.S.C. Sec. 2740(a) provides:
 
 7
 To the extent consistent with the number of educationally deprived children in the school district of the local educational agency who are enrolled in private elementary and secondary schools, such agency shall make provision for including special educational services and arrangements (such as dual enrollment, educational radio and television, and mobile educational services and equipment) in which such children can participate.... Expenditures for educational services and arrangements pursuant to this section for educationally deprived children in private schools shall be equal (taking into account the number of children to be served and the special educational needs of such children) to expenditures for children enrolled in the public schools of the local educational agency.
 
 
 8
 Regulations issued by the Secretary require that each LEA provide services designed to meet the needs of educationally deprived children who attend private schools, see 45 C.F.R. Sec. 116a.23. Going somewhat beyond the statute, the regulations provide that the types of services to be provided shall be determined "on a basis comparable to that used in providing for the participation of public school children." Id.[2]
 
 
 9
 The New York City Board of Education ("the Board") has developed elaborate procedures, not questioned here, for identifying the "target public school attendance areas" satisfying the economic disadvantage criteria for Title I eligibility[3], see 20 U.S.C. Sec. 2732, and the students in need of remedial instruction, see 20 U.S.C. Sec. 2734(b). New York State has developed procedures, also not criticized here, for determining New York City's share of the Title I funds received by it. The New York City Board of Education allocates these funds between public and nonpublic school children according to a per capita formula based on the total number of public and nonpublic school students determined to be eligible for Title I services. These amounts are then scaled down to take account of budgetary constraints. In 1981-82 the nonpublic school population benefitting from the City's Title I program constituted 13.2% of the total. The constitutional problem arises from the fact that the vast majority of these nonpublic school students attend religious schools, with schools affiliated with the Roman Catholic Archdiocese of New York and the Diocese of Brooklyn accounting for 84% of such students and Hebrew day schools accounting for another 8% (1981-82 figures).
 
 
 10
 The City's initial Title I program for nonpublic school students required them to travel to public schools after regular school hours to receive remedial services from public school employees. When attendance lagged, the Board transferred some Title I services to nonpublic schools after regular school hours while maintaining other services at off-premises sites. Attendance, however, remained poor. The reasons assigned for the failure of the programs were that both students and teachers were tired, that there was concern about the safety of the children traveling home after dark or in inclement weather, and that communication between Title I teachers and other professionals and the regular classroom teachers of the nonpublic schools was virtually impossible. A solution whereby nonpublic school students could participate with public school students in programs conducted at public schools during the regular school day was rejected in part because of doubts whether under Art. XI, Sec. 3, of the New York Constitution[4] nonpublic school students could participate with public school students in programs conducted on public school premises during regular school hours. In consequence, on August 31, 1966, the Board adopted a resolution that remedial reading, remedial arithmetic, speech therapy and guidance counseling for educationally disadvantaged children in nonpublic schools be provided on the latters' own premises by peripatetic public school employees who would go from one school to another during the school day. Essentially that program has been continued to the present time. A study made for the 1977-78 school year indicated that a program whereby the nonpublic school students would be transplanted to public schools would involve additional expense for transportation and other costs of more than $4.2 million, which would have been more than 42% of the budget for the nonpublic school Title I program. Apart from the large reduction in instructional and other services thereby entailed, the off-premises program, as alleged by the City, would have been less effective for reasons already indicated.
 
 
 11
 We interrupt this statement of the facts to indicate how the case comes before us. In 1976, the National Coalition for Public Education and Religious Liberty brought an action in the District Court for the Southern District of New York against the Secretary of Health, Education and Welfare, the United States Commissioner of Education, and the Chancellor of the New York City Board of Education to enjoin the program thus partially described as violative of the Establishment Clause. See National Coalition for Public Education & Religious Liberty v. Harris, 489 F.Supp. 1248 (S.D.N.Y.), appeal dismissed, 449 U.S. 808, 101 S.Ct. 55, 66 L.Ed.2d 11 (1980) [hereafter cited as "PEARL "]. An evidentiary hearing was conducted before a three-judge court in May 1979. Pursuant to an agreement reached at a pretrial conference the defendants presented the bulk of their case in the form of a narrative summary which synthesized numerous affidavits and documentary evidence describing the operations of the City's Title I program in nonpublic schools. A few witnesses were also called. In an able opinion by Senior District Judge Tenney, the court expressed itself satisfied that the program as carried out did not violate the Establishment Clause and dismissed the complaint. An appeal to the Supreme Court was dismissed for want of jurisdiction, 449 U.S. 808, 101 S.Ct. 55, 66 L.Ed.2d 11 (1980). We were told at argument that this was because of untimeliness.
 
 
 12
 Meanwhile, on August 11, 1978, this action for declaratory and injunctive relief with respect to the City's plan was brought by six federal taxpayers, see Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), in the District Court for the Eastern District of New York but was stayed pending the final determination of the PEARL case. Four individuals whose children attend nonpublic schools in the City and receive remedial educational assistance under Title I, represented by the same counsel who had represented the parent intervenors in PEARL, were permitted to intervene as defendants. The parties stipulated that the case was to be decided upon the record in PEARL, along with certain affidavits supplementing those previously filed. Judge Neaher, agreeing with the three-judge court in PEARL, granted defendants' motion for summary judgment and dismissed the complaint. Plaintiffs did not dispute the correctness of defendants' assertions about the basic facts, as distinguished from interlarded conclusions, insofar as such facts could be within the knowledge of the witnesses and affiants, and we have drawn and will continue to draw upon the various statements and affidavits, particularly the defendants' Statement of Material Facts Not In Dispute under former Rule 9(g) of the Eastern District, generally without particularizing the source.
 
 
 13
 Under the City's program the Board provides nonpublic school students--primarily, as we have stated, students enrolled in religious schools--with five types of remedial services: remedial reading, reading skills centers, remedial mathematics, English as a second language, and clinical and guidance services. No form of remedial service is provided with Title I funds if it is being provided by the nonpublic schools. The first four types of services are described in the margin.[5] The clinical and guidance program is designed to enhance achievement in the four instructional programs by providing diagnosis and treatment by guidance counselors, school psychologists, social workers and psychiatrists. The instructional services are generally provided to groups of about 10 students with an emphasis on individualized instruction. The clinical and guidance professionals generally deal with students on an individual basis.
 
 
 14
 The teachers and other professionals engaged in the City's nonpublic school program are, with the exception of some physicians under special contract, regular salaried employees of the Board who have applied for such assignments. Religion is not a factor in the assignment. Determination of which nonpublic schools a teacher or other professional shall serve is made by the administrators of the City's Bureau of Nonpublic School Reimbursable Services. The amount of time that a particular teacher or other professional will spend at any one nonpublic school is determined by the number of students eligible for the Title I program and the needs of such students. During the 1981-82 school year, some 78% of all Title I teachers and other professionals spent less than five days a week in the same public school and worked in more than one; children in 180 of the 231 nonpublic schools with Title I services received these from itinerant teachers; all non-teacher professionals were itinerant. Affidavits of a considerable number of teachers demonstrate that a large majority work in nonpublic schools with religious affiliations different from their own.
 
 
 15
 Instructions issued to the teachers and other professionals by the Bureau of Nonpublic School Reimbursable Services emphasize their accountability to their Title I supervisor and their nonaccountability to any nonpublic school official. They are solely responsible for the selection of students for the program and are to take all necessary steps to assure that materials and equipment provided for Title I activities are used only therein. They are not to engage in team-teaching or other cooperative instructional activities with nonpublic school teachers, to become involved with religious activities of the nonpublic schools or to introduce any "religious matter" into their teaching. While it is deemed necessary for the Title I teacher to confer with the regular classroom teachers of the nonpublic schools concerning the students' needs and progress in that classroom environment, the Title I teachers are instructed to confine these consultations to mutual professional concerns about the students' educational needs and not to engage in any discussion of matters of a religious nature.
 
 
 16
 The Title I teachers and other professionals are subject to the supervision of field supervisors, each of whom is ordinarily responsible for 22 Title I teachers and attempts to make at least one unannounced visit per month. The field supervisors are in turn supervised by program coordinators. While they too make occasional unannounced visits, a principal method of carrying out their responsibilities is through monthly in-service training sessions, frequently held on days when the public schools are in session but the nonpublic schools are observing a religious holiday. Defendants emphasize the absence of any recorded complaint by a Title I teacher of interference by nonpublic school authorities or of any reports by supervisors that teachers have engaged in religious activity.
 
 
 17
 Teaching materials and equipment used in the Title I program are selected by City employees. The teaching materials are not to duplicate materials used in regular classroom instruction or to have any religious content. All such equipment and materials are labeled as property of the Board for use in the Title I program, are locked in storage and filing cabinets when not in use and are subject to an annual inventory.
 
 
 18
 Before approving the assignment of Title I teachers or other professionals to a nonpublic school, an administrator of the Board's Office of Special Projects informs the principal of applicable federal, state and local guidelines, including the requirement that any room used for Title I instruction or support services be free of religious symbols and artifacts. Nonpublic schools with children receiving Title I instructional services "typically" reserve a classroom for the exclusive use of Title I teachers. The clinical and guidance professionals customarily use the nurse's room or a comparable facility. Defendants assert broadly that "[n]one of the nonpublic school facilities used for Title I remedial instruction or support services contains any religious statues, symbols, pictures or artifacts."
 
 
 19
 Administrative contacts between the Board's Office of Special Projects and nonpublic school officials are said to be of a routine character, falling into three general categories--the Board's dissemination of information, its processing of requests for services by the nonpublic schools, and its annually requesting information needed for a survey of the workings of the program. While there have been criticisms of nonpublic school principals by the Board and vice versa, none of them has turned on matters of religion.
 
 
 20
 Defendants' statement of the facts concerning the operation of the Title I program in nonpublic schools may be summarized by quoting an observation from a 1971 report by the United States Office of Education: "Title I creates the unusual situation in which an educational program may operate within the private school structure but be totally removed from the administrative control and responsibility of the private school." United States Office of Education (USOE) Program Guide No. 44 (1968), reproduced in Title I ESEA, Participation of Private School Children, A Handbook for State and Local Officials, U.S. Department of Health, Education and Welfare, Publication No. (OE) 72-62, p. 8 (1971).
 
 DISCUSSION
 
 21
 1) The Supreme Court's decisions with respect to government aid to religious schools
 
 
 22
 Although the briefs have included a generous sampling of the Supreme Court's decisions in regard to the Establishment Clause, there are a sufficient number dealing with the problem of government aid to religious schools and, indeed, with the very problem here presented--the sending of public school teachers and other professionals into such schools to engage in remedial teaching and to provide clinical and guidance services--that we think it best to confine ourselves largely to these decisions, with particular emphasis on the latter. In a field that has been so thoroughly ploughed by the Supreme Court, the function of an inferior federal court is not to make an independent interpretation of the constitutional text or to engage in creative distinctions but to do its best to follow what the Court has said. We have thought it necessary to analyze the Court's relevant pronouncements at some length, and generally in chronological order, since our reading of many of them differs materially from that of the three-judge court in PEARL, supra, 489 F.Supp. 1248.
 
 
 23
 The starting point of modern Establishment Clause jurisprudence on state aid to parochial schools is Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947). There, after a thorough exposition of the history and purpose of the Establishment Clause by Justice Black, a bare majority of the Court held that the clause was not violated by a state's spending tax-raised funds to reimburse parents of parochial school pupils for their children's bus fares as part of a general program under which it paid the fares of pupils attending public and other non-profit schools; Justice Black thought that such action "approache[d] the verge" of the state's constitutional power, 330 U.S. at 16, 67 S.Ct. at 511. Four Justices, in two eloquent dissents by Justices Jackson and Rutledge, believed it went over the verge.
 
 
 24
 A score of years later, the Court moved the verge a considerable distance in Board of Education v. Allen, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968), where it sustained a New York law requiring local public school authorities to lend textbooks free of charge to all students in grades 7 to 12, including those in private schools. Justice White placed some emphasis on the fact that "[b]ooks are furnished at the request of the pupil and ownership remains, at least technically, in the State. Thus no funds or books are furnished to parochial schools, and the financial benefit is to parents and children, not to schools." 392 U.S. at 243-44, 88 S.Ct. at 1926. Justice Black dissented, finding a basic distinction between the provision of transportation, lunches, and police and fire protection, and the lending of textbooks, 392 U.S. at 252-53, 88 S.Ct. at 1931. Justices Douglas and Fortas also filed dissents.
 
 
 25
 The Court returned to the subject in Lemon v. Kurtzman and its companion case, Earley v. DiCenso, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). Chief Justice Burger pointed out, as had Justice Rutledge in his dissent in Everson, that the Establishment Clause prohibits not simply the establishment of a state church but any law "respecting" an establishment of religion, and that "[a] given law might not establish a state religion but nevertheless be one 'respecting' that end in the sense of being a step that could lead to such establishment and hence offend the First Amendment." 403 U.S. at 612, 91 S.Ct. at 2111 (emphasis in original). He continued, in what has become an oft-quoted passage, 403 U.S. at 612-13, 91 S.Ct. at 2111:
 
 
 26
 Every analysis in this area must begin with consideration of the cumulative criteria developed by the Court over many years. Three such tests may be gleaned from our cases. First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion ...; finally, the statute must not foster "an excessive government entanglement with religion."
 
 
 27
 Excessive entanglement was found to exist in a Rhode Island statute providing for up to a 15% salary supplement to teachers in nonpublic schools in which the average per-pupil expenditure on secular education was below the average in public schools, conditioned on the teachers' giving only courses offered in the public schools, using only materials used in the public schools and agreeing not to teach courses in religion. Excessive entanglement was found also in a Pennsylvania statute authorizing the state's "purchase" of certain "secular educational services" from nonpublic schools, such purchase being restricted to courses in specified subjects, with the textbooks and materials to be approved by the state and with no payment to be made for any course containing any subject matter reflecting religious teachings or the morals or forms of worship of any sect.[6]
 
 
 28
 The Court said, with respect to the Rhode Island statute, 403 U.S. at 619, 91 S.Ct. at 2114:
 
 
 29
 A comprehensive, discriminating, and continuing state surveillance will inevitably be required to ensure that these restrictions are obeyed and the First Amendment otherwise respected. Unlike a book, a teacher cannot be inspected once so as to determine the extent and intent of his or her personal beliefs and subjective acceptance of the limitations imposed by the First Amendment. These prophylactic contacts will involve excessive and enduring entanglement between state and church.
 
 
 30
 The Pennsylvania statute suffered from the same defect, exacerbated by the fact that it provided state financial aid directly to the sectarian schools, an arrangement " 'pregnant with involvement' " between church and state. 403 U.S. at 622, 91 S.Ct. at 2115 (quoting Walz v. Tax Commission, 397 U.S. 664, 675, 90 S.Ct. 1409, 1414, 25 L.Ed.2d 697 (1970)). The Court spoke also of "[a] broader base of entanglement" inherent in "the divisive political potential of these state programs", and said that this potential was aggravated "by the need for continuing annual appropriations and the likelihood of larger and larger demands as costs and populations grow", 403 U.S. at 622-23, 91 S.Ct. at 2116-17. The Chief Justice also pointedly remarked, 403 U.S. at 624-25, 91 S.Ct. at 2115-16.
 
 
 31
 Nor can we fail to see that in constitutional adjudication some steps, which when taken were thought to approach "the verge," have become the platform for yet further steps. A certain momentum develops in constitutional theory and it can be a "downhill thrust" easily set in motion but difficult to retard or stop. Development by momentum is not invariably bad; indeed, it is the way the common law has grown, but it is a force to be recognized and reckoned with. The dangers are increased by the difficulty of perceiving in advance exactly where the "verge" of the precipice lies. As well as constituting an independent evil against which the Religion Clauses were intended to protect, involvement or entanglement between government and religion serves as a warning signal.
 
 
 32
 On the same day as Lemon, the Court decided Tilton v. Richardson, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1972). A bare majority sustained, with one qualification, provisions of the Higher Education Facilities Act of 1963, which authorized federal grants to institutions of higher education, which the Court construed as including church-related institutions, for the construction of facilities other than those used for sectarian instruction, for religious worship, or primarily in connection with the program of a school or department of divinity. The statutory restrictions were to be enforced by the Office of Education primarily by way of on-site inspections. This result, seemingly at odds with that in Lemon, rested in large part on the Court's conclusion, 403 U.S. at 685, 91 S.Ct. at 2099, that "[t]here are generally significant differences between the religious aspects of church-related institutions of higher learning and parochial elementary and secondary schools." Quoting from Walz v. Tax Commission, 397 U.S. 664, 671, 90 S.Ct. 1409, 1412, 25 L.Ed.2d 697 (1970) (sustaining tax exemptions to religious organizations), the Court said that the "affirmative if not dominant policy" of the instruction in pre-college church schools is "to assure future adherents to a particular faith by having control of their total education at an early age", whereas Congress might well have thought that college students were less impressionable and less susceptible to religious indoctrination. The Court noted that, by nature, "college and postgraduate courses tend to limit the opportunities for sectarian influence by virtue of their own internal disciplines", and that "[m]any church-related colleges and universities are characterized by a high degree of academic freedom and seek to evoke free and critical responses from their students", 403 U.S. at 686, 91 S.Ct. at 2099 (footnote omitted). The evidence showed that the four schools there in question, while governed by Catholic religious organizations and having predominantly Catholic faculties and student bodies, admitted non-Catholics as students and gave faculty appointments to non-Catholics. None required students to attend religious services and, although all four required students to take theology courses, the parties had stipulated that these were taught according to the academic requirements of the subject matter, covered a range of human religious experiences, and made no attempt to indoctrinate students or to proselytize. Since religious indoctrination was not a substantial purpose or activity of these church-related colleges and universities, there was less likelihood than in primary and secondary schools that religion would permeate the area of secular education. The inspections "necessary to ascertain that the facilities are devoted to secular education" were therefore characterized as "minimal", 403 U.S. at 687, 91 S.Ct. at 2100. Emphasis was also placed on the fact that the Government was subsidizing buildings, not--as in Lemon --teachers, who "are not necessarily religiously neutral", and that the Government aid was "a one-time, single-purpose grant", 403 U.S. at 687-88, 91 S.Ct. at 2100. Finally, the Court observed that these factors, plus the diverse and widely dispersed student constituency of colleges and universities, also substantially lessened the potential for divisive religious fragmentation in the political arena.
 
 
 33
 Tilton was followed, again with respect to a college, by a differently composed Court, this time by a vote of 6-3, in Hunt v. McNair, 413 U.S. 734, 93 S.Ct. 2868, 37 L.Ed.2d 923 (1973).[7] In contrast, Committee for Public Education & Religious Liberty v. Nyquist, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973), decided the same day as Hunt, struck down three financial aid programs which New York had devised for nonpublic elementary and secondary schools. One program was an annual grant of $30 or $40 per student for maintenance and repair of facilities and equipment to ensure students' health, welfare and safety in schools serving a high concentration of low-income families, not, however, to exceed 50% of the average per-pupil cost of equivalent maintenance and repair services in the public schools. A second program reimbursed parents of children attending nonpublic elementary or secondary schools whose annual taxable income was less than $5,000, in amounts of $50 per grade school child and $100 per high school student so long as those amounts did not exceed 50% of tuition actually paid. The third program authorized income tax deductions, in amounts decreasing as gross income increased, for each dependent child in a nonpublic school for whom the parent had paid at least $50 in tuition. Justice Powell, writing for a majority, held that each of these programs violated Lemon 's "primary effect" test. Referring to Everson, Allen, and Tilton, he recognized that "some forms of aid may be channeled to the secular without providing direct aid to the sectarian", but characterized these cases as showing that "the channel is a narrow one." 413 U.S. at 775, 93 S.Ct. at 2966. While the holding that the programs had the impermissible primary effect of advancing religion made consideration of the entanglement issue unnecessary, Justice Powell felt prompted, 413 U.S. at 794, 93 S.Ct. at 2976,
 
 
 34
 to make the further observation that, apart from any specific entanglement of the State in particular religious programs, assistance of the sort here involved carries grave potential for entanglement in the broader sense of continuing political strife over aid to religion.
 
 
 35
 He went on to say, much as the Chief Justice had done in Lemon, that
 
 
 36
 we know from long experience with both Federal and State Governments that aid programs of any kind tend to become entrenched, to escalate in cost, and to generate their own aggressive constituencies. And the larger the class of recipients, the greater the pressure for accelerated increases. Moreover, the State itself, concededly anxious to avoid assuming the burden of educating children now in private and parochial schools, has a strong motivation for increasing this aid as public school costs rise and population increases. In this situation, where the underlying issue is the deeply emotional one of Church-State relationships, the potential for seriously divisive political consequences needs no elaboration. And while the prospect of such divisiveness may not alone warrant the invalidation of state laws that otherwise survive the careful scrutiny required by the decisions of this Court, it is certainly a "warning signal" not to be ignored.
 
 
 37
 413 U.S. at 797-98, 93 S.Ct. at 2977-78 (footnotes omitted). The Court followed Nyquist in two more cases decided that day. In Sloan v. Lemon, 413 U.S. 825, 93 S.Ct. 2982, 37 L.Ed.2d 939 (1973), it invalidated a similar Pennsylvania tuition reimbursement scheme. In Levett v. Committee for Public Education & Religious Liberty, 413 U.S. 472, 93 S.Ct. 2814, 37 L.Ed.2d 736 (1973), in an opinion by the Chief Justice, it applied Nyquist to invalidate another New York program under which the state reimbursed nonpublic schools for certain costs of administering tests "mandated" by the state but prepared by the nonpublic schools; only Justice White dissented. A different view was later to be taken with respect to state-prepared tests, whether graded solely by the state, as in Wolman v. Walter, 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977), or in part by nonpublic school personnel, as in Committee for Public Education & Religious Liberty v. Regan, 444 U.S. 646, 100 S.Ct. 840, 63 L.Ed.2d 94 (1980).
 
 
 38
 It is with this background that we come to the four cases in which the Court has considered programs such as that here sub judice.
 
 
 39
 Wheeler v. Barrera, 417 U.S. 402, 94 S.Ct. 2274, 41 L.Ed.2d 159 (1974), was the first case in which the Court gave plenary consideration to the application of Title I of the Act to parochial schools.[8] Parents of children attending nonpublic schools in the inner city area of Kansas City, Missouri, complained that the State Commissioner of Education and the Missouri Board of Education were violating Title I in that they were allocating money to Title I programs in public schools but not making "comparable" expenditures for children in parochial schools in the district. Although remedial teachers were employed in the public schools, the defendants had failed to send public school teachers into the parochial schools during regular hours on the grounds that this was forbidden under Missouri law and the First Amendment and that Title I did not so require. On the other hand, mobile educational services and equipment, visual aids, and educational radio and television had been provided, as had been teachers for afterschool, weekend, and summer school classes, apparently held in the public schools but open to parochial school pupils. A divided court of appeals held that the defendants were in violation of the Act, see 475 F.2d 1338 (8 Cir.1973).
 
 
 40
 The Court, in an opinion by Justice Blackmun, considered the case to present two issues: "First, whether Title I requires the assignment of publicly employed teachers to provide remedial instruction during regular school hours on the premises of private schools attended by Title I eligible students, and, second, whether that requirement, if it exists, contravenes the First Amendment." 417 U.S. at 415, 94 S.Ct. at 2282. The Court answered the first question by saying that Title I permitted but did not require such assignment. The Court declined to pass on the second issue since no order had been entered requiring "public school teachers paid with Title I funds [to be sent] into parochial schools to teach remedial courses", 417 U.S. at 426, 94 S.Ct. at 2287. The Court went on to say:
 
 
 41
 Moreover, even if, on remand, the state and local agencies do exercise their discretion in favor of [on-premises] instruction, the range of possibilities is a broad one and the First Amendment implications may vary according to the precise contours of the plan that is formulated. For example, a program whereby a former parochial school teacher is paid with Title I funds to teach full time in a parochial school undoubtedly would present quite different problems than if a public school teacher, solely under public control, is sent into a parochial school to teach special remedial courses a few hours a week. At this time we intimate no view as to the Establishment Clause effect of any particular program.
 
 
 42
 Id. (emphasis supplied).
 
 
 43
 We think Wheeler has little bearing on the present case. It shows only that a majority of the Court regarded the question of the constitutionality of sending public school teachers into parochial schools to perform Title I programs to be debatable, with Justice Douglas indicating a clear preference for a holding of unconstitutionality, Justice White indicating a clear preference for a holding of constitutionality, and Justice Powell voicing "serious misgivings" in regard to constitutionality.[9] The case does not stand for the proposition, intimidated in PEARL, supra, 489 F.Supp. at 426, that programs like the one here at issue are to be judged by their results. The holding in Wheeler was simply that the Court would not decide an issue that had not been and might never be presented, with a statement that when and if it was, decision might "vary according to the precise contours of the plan that is formulated"; the Court was at pains to say that it "intimate[d] no view as to the Establishment Clause effect of any particular program." 417 U.S. at 426, 94 S.Ct. at 2287.
 
 
 44
 In fact, at that very time the Court had under advisement a case substantially raising the constitutional issue bypassed in Wheeler and decided it summarily on the side of unconstitutionality only a week later, Public Funds for Public Schools v. Marburger, 417 U.S. 961, 94 S.Ct. 3163, 41 L.Ed.2d 1134 (1974), aff'g mem. 358 F.Supp. 29 (D.N.J.1973).[10] A New Jersey statute furnished state aid to the parents of nonpublic school students in amounts up to $10 per elementary school student and $20 per high school student as reimbursement for the cost of secular, nonideological textbooks, instructional materials and supplies. It also provided that the amount left from the total appropriation after the textbook reimbursement program was funded would be assigned directly to nonpublic schools, in proportion to their enrollments, to permit them to acquire secular supplies, equipment and "auxiliary services". The latter were defined in the New Jersey Administrative Code as "nonadministrative services provided by personnel other than regular classroom teachers, school librarians, principals or other supervisory personnel to students whose special needs are not met in a standard or regular school program." These were, typically, remedial and corrective instruction and diagnostic services in reading and mathematics, corrective instruction in speech, adaptive or corrective instruction in physical education, guidance counseling and testing services, and psychological testing and diagnostic services. 358 F.Supp. at 39. Personnel providing such services were required to be employees of the board of education, to be certified by the State Board of Examiners if such certification was required of similar personnel assigned to public schools, and to be under the supervision of the local board of education. Id.
 
 
 45
 The three-judge court struck down the provision in regard to auxiliary services, as it did the other provisions of the New Jersey statute. Responding to defendants' argument that no entangling surveillance would be required because "the processes which would be involved in remedial reading or remedial arithmetic are clearly more peripheral to the possibility of religious indoctrination than the initial teaching of reading and arithmetic", the three-judge court emphasized that "a teacher who teaches reading or remedial reading remains a teacher" and that "[a] teacher's instruction may vary in content or emphasis and is not entirely predictable .... This being so, it would be necessary to continually review the content of a teacher's instruction in order to see that it adheres to the restrictions imposed by the statute, in that it be confined only to secular and nonideological subject matter." 358 F.Supp. at 40. The court further pointed out that the teachers would "be working in atmospheres dedicated to the rearing of children in a particular religious faith", and that "a constant review of that instruction would be required in order to determine that the religious atmosphere has not caused religion to be reflected--even unintentionally--in the instruction provided by such teachers." Id. The court also alluded to the potential-for-political-divisiveness argument which the Chief Justice had elaborated for the first time in Lemon and Justice Powell had repeated in Nyquist. We forbear further discussion of the summary affirmance in Marburger since much of the same ground was to be covered in the Supreme Court decision next discussed.
 
 
 46
 We come then to Meek v. Pittenger, 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975), the most pertinent to this case of all the Court's Establishment Clause decisions. In Part V of the plurality opinion, written by Justice Stewart for himself, Justice Blackmun and Justice Powell, and concurred in by Justice Brennan for himself, Justice Douglas and Justice Marshall[11] over sharp dissents by Chief Justice Burger and Justice Rehnquist, the latter being joined by Justice White, the Court held unconstitutional a Pennsylvania statute, Act 194, which authorized the Secretary of Education to provide "auxiliary services" to all children enrolled in nonpublic elementary and secondary schools meeting Pennsylvania's compulsory attendance requirements.[12] These included
 
 
 47
 guidance, counseling and testing services; psychological services; services for exceptional children; speech and hearing services; services for the improvement of the educationally disadvantaged (such as, but not limited to, teaching English as a second language), and such other secular, neutral, nonideological services as are of benefit to nonpublic school children and are presently or hereafter provided for public school children of the Commonwealth.
 
 
 48
 The teaching and other services were to be provided in the nonpublic schools by personnel drawn from a division of the public school system that had been established to provide similar services to public school children. A divided three-judge district court, see 374 F.Supp. 639 (E.D.Pa.1974), had sustained this against an attack on entanglement grounds on the basis that continuing supervision of the personnel providing auxiliary services would not be necessary to guarantee that a member of the auxiliary-service staff had not "succumb[ed] to sectarianization of his or her professional work", 374 F.Supp. at 657. Justice Stewart began by finding that this was error, see 421 U.S. at 369-70, 95 S.Ct. at 1765, citing Earley v. DiCenso, the companion case to Lemon v. Kurzman, supra, 403 U.S. 602, 91 S.Ct. at 2105, which had held that a statute subsidizing the teaching of secular subjects by religious school teachers would "inevitably" require "comprehensive, discriminating, and continuing state surveillance" to insure that instruction would be religiously neutral. Justice Stewart saw no sufficient distinction in the fact that the Act 194 teachers would be dealing with remedial (and occasionally exceptional) students. "[T]he likelihood of inadvertent fostering of religion may be less in a remedial arithmetic class than in a medieval history seminar, but a diminished probability of impermissible conduct is not sufficient: 'The State must be certain, given the Religion Clauses, that subsidized teachers do not inculcate religion' ", 421 U.S. at 370-71, 95 S.Ct. at 1765-66 (quoting Earley v. DiCenso, supra, 403 U.S. at 619, 91 S.Ct. at 2114). Even more important for us--indeed dispositive unless affected by a later decision--is the immediately following passage wherein the Meek majority refused to recognize any distinction from Earley and Lemon based on the fact that "the teachers and counselors providing auxiliary services are employees of the public intermediate unit, rather than of the church-related schools in which they work." This "does not substantially eliminate the need for continuing surveillance." While the auxiliary-service personnel were not subject to the discipline of a religious authority, they were "performing important educational services in schools in which education is an integral part of the dominant sectarian mission and in which an atmosphere dedicated to the advancement of religious belief is constantly maintained." It followed that "[t]o be certain that auxiliary teachers remain religiously neutral, as the Constitution demands, the State would have to impose limitations on the activities of auxiliary personnel and then engage in some form of continuing surveillance to ensure that those restrictions were being followed." 421 U.S. at 372, 95 S.Ct. at 1766. Also noting the potential-for-divisive-conflict theme that had been sounded in Lemon, supra, 403 U.S. at 622-23, 91 S.Ct. at 2115-16, and repeated in Nyquist, supra, 413 U.S. at 794, 93 S.Ct. at 2976, Justice Stewart concluded that
 
 
 49
 [t]his potential for political entanglement, together with the administrative entanglement which would be necessary to ensure that auxiliary-services personnel remain strictly neutral and non-ideological when functioning in church-related schools ... compels the conclusion that Act 194 violated the constitutional prohibition against laws "respecting an establishment of religion."
 
 421 U.S. at 372, 95 S.Ct. at 1766.[13]
 
 50
 The last of the four cases relating to government funding of auxiliary services for parochial school students is Wolman v. Walter, 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977). This dealt with an Ohio statute, Ohio Rev.Code Ann. Sec. 3317.06 (Supp.1976), providing a variety of forms of state aid to nonpublic elementary and secondary schools, most of which were sectarian. The statute was enacted after the decision in Meek v. Pittenger and was "obviously ... an attempt to conform to the teachings of that decision", as the state acknowledged, 433 U.S. at 233, 97 S.Ct. at 2597. Our concern is with two portions of the Ohio law. Sections 3317.06(D) and (F) authorized expenditure of state funds to supply speech and hearing diagnostic services and diagnostic psychological services to pupils attending nonpublic schools within the district, all to be provided in the nonpublic school by employees of the local board of education, or a physician hired thereby, with any treatment to take place off the nonpublic school premises. Sections 3317.06(G), (H), (I) and (K) authorized expenditure of funds for certain therapeutic guidance, and remedial services to help nonpublic school students who had been identified as needing specialized attention. These services were to be performed only in public schools, in public centers, or in mobile units located off the nonpublic school premises.
 
 
 51
 Taking first the on-premises diagnostic services, Justice Blackmun began by agreeing with the finding of the district court that the danger that the diagnostic speech and hearing staff or the psychological diagnostician might engage in the impermissible inculcation of religion was "insubstantial". 433 U.S. at 242, 97 S.Ct. at 2602. He perceived no sufficient basis for distinguishing these diagnostic services from the portions of the statute funding physician's, nursing, dental and optometric services in nonpublic schools--services of the sort that the Court had approved in Lemon, supra, 403 U.S. at 616-17, 91 S.Ct. at 2113, and which the Wolman plaintiffs had not challenged. He recognized the binding authority of Meek but distinguished the role of the diagnostician from that of the teacher or guidance counselor in that it "does not provide the same opportunity for the transmission of sectarian views as attends the relationship between teacher and student or that between counselor and student." 433 U.S. at 244, 97 S.Ct. at 2603.
 
 
 52
 The plaintiffs' attack on the portions of the statute funding off-premises therapeutic services was limited to the situation in which such services were not provided to public and nonpublic school students simultaneously. This, plaintiffs contended, created a risk that sectarian pupils might be isolated and the public employees tempted to "tailor [their] approach to reflect and reinforce the ideological view of the sectarian school attended by the children", thereby directly aiding the sectarian institution. 433 U.S. at 246, 97 S.Ct. at 2604. Justice Blackmun answered by construing the statute, as had the district court, "to authorize services only on sites that are 'neither physically nor educationally identified with the functions of the nonpublic school' ", with the result that "the services are to be offered under circumstances that reflect their religious neutrality", 433 U.S. at 246-47, 97 S.Ct. at 2604-05--precisely the opposite of the situation here presented. He conceded that Meek had "acknowledged the danger that publicly employed personnel who provide services analogous to those at issue here might transmit religious instruction and advance religious beliefs in their activities." But he noted that the Court had emphasized in Meek
 
 
 53
 that this danger arose from the fact that the services were performed in the pervasively sectarian atmosphere of the church-related school .... The danger existed there, not because the public employee was likely deliberately to subvert his task to the service of religion, but rather because the pressures of the environment might alter his behavior from its normal course.
 
 
 54
 433 U.S. at 247, 97 S.Ct. at 2605. Accordingly, he held that "[s]o long as these types of services are offered at truly religiously neutral locations, the danger perceived in Meek does not arise", even when the students are exclusively sectarian pupils, since "[t]he influence on a therapist's behavior that is exerted by the fact that he serves a sectarian pupil is qualitatively different from the influence of the pervasive atmosphere of a religious institution." Id. He added that there would be no excessive entanglement since "[i]t can hardly be said that the supervision of public employees performing public functions on public property creates an excessive entanglement between church and state." 433 U.S. at 248, 97 S.Ct. at 2605 (emphasis supplied).
 
 
 55
 Justice Blackmun's defense of the diagnostic and therapeutic provisions of the statute occupied, respectively, Parts V and VI of his opinion. The Chief Justice and Justices Stewart, Marshall, Powell and Stevens joined in Part V, relating to diagnostic services; the Chief Justice and Justices Stewart, Powell and Stevens joined in Part VI, relating to therapeutic services.[14] Justices White and Rehnquist concurred in the judgment in these parts for the reasons stated by the former in Nyquist and by the latter in Meek. Justice Marshall would have denied the attack on diagnostic but would have sustained that on therapeutic services; Justice Brennan would have sustained the attacks on both. Hence there were five Justices who upheld government funding of therapeutic services for parochial school students only if these were provided in public facilities, and two who would have found even that to violate the Establishment Clause.
 
 
 56
 This analysis of the Court's decisions concerning public aid to religious school leads inescapably to the conclusion that public funds can be used to afford remedial instruction or related counseling services to students in religious elementary and secondary schools only if such instruction or services are afforded at a neutral site off the premises of the religious school. The Supreme Court's Establishment Clause jurisprudence from Everson to Wolman has been entirely consistent on the point that whatever forms of state aid may be given to religious elementary and secondary schools, these must not create a risk, sufficiently significant to require policing, that public school personnel will act, even unwittingly, to foster religion. Teachers and those who provide clinical and guidance services of the sort here at issue are engaged in occupations in which the performance of one's duties may be subtly and all too easily influenced by a sectarian milieu.[15] To be sufficiently certain that public employees, in a program like the present one, will maintain strict religious neutrality, they and the institutions in which they work must be subjected to "comprehensive, discriminating and continuing state surveillance", Lemon v. Kurtzman, supra, 403 U.S. at 619, 91 S.Ct. at 2114. This itself is a constitutionally excessive entanglement of church and state.[16]2) Appellees' attempted distinction based on the working of New York City's plan
 
 
 57
 Appellees' principal basis for urging us to sustain the validity of the program here at issue is that the position taken by the Court in Meek, as reaffirmed and refined in Wolman, must yield to the considerable evidence concerning the actual working of the City's provision of on-premises remedial instruction and guidance services. Analysis will show that this evidence, even if taken at face value, goes mainly to appellees' contention that New York City's plan has not advanced religion, and a complete and sufficient answer, as already pointed out, is that Meek did not rest on a conclusion that Act 194 had actually fostered religion but rather on a conclusion that, in order to be sure that it would not, Pennsylvania would be required to monitor its operation so closely as to violate the entanglement test, and we place our decision on that ground without need to decide whether New York City's program fails Lemon's "primary effect" test. However, in the interest of completeness and in deference to the three-judge court in PEARL and the district judge here, we shall state other reasons for finding appellees' argument to be flawed.
 
 
 58
 First, as regards their contention that Title I has not fostered religion, appellees experience the difficulty always confronted by one having to prove a negative. Even if the evidence were still more extensive than it is, it could not dispel the possibility that in some significant number of instances a public school teacher has succumbed to, or indeed embraced, the religious influences that bear on anyone offering instruction or guidance in rooms that are part and parcel of a religious school, although religious symbols and artifacts have been removed therefrom.[17] The force of this consideration is heightened by the lack of any incentive for complaint. The nonpublic schools, which had to apply for Title I assistance, are happy to have it, even, perhaps all the more, if an occasional teacher or counselor has strayed into religious paths. Similar considerations apply to the students; they have chosen to have, or at least have become used to having, some degree of religious content in their instruction, and are unlikely to notice or to complain if some of this should find its way into the remedial classroom or counseling center. The same considerations apply to the parents. Teachers and counselors will not complain of their own conduct even assuming they recognize, as they may not always do, that they have crossed the line. The visits of the Title I supervisors are sporadic and, while unannounced, are not unnoticed. Moreover, these visits do not disclose what goes on in the frequent contacts between the regular and the remedial teachers (or other professionals), in which each side reports on individual student needs, problems encountered, and results achieved. All these conferences are held in the religious school--just where does not clearly appear--and it is practically inconceivable that the general atmosphere of the school should not enter into them in any degree.[18] Greater certainty that these opportunities for influence will not lead to public employees' acting so as to foster religion can be achieved only by still greater supervision, but this would mean greater entanglement. This is the very point of the discussion in Meek, 421 U.S. at 369-70, 95 S.Ct. 1765. Earlier decisions, notably Earley v. DiCenso, supra, had made it clear that, because "[t]he State must be certain, given the Religion Clauses, that subsidized teachers do not inculcate religion ...", 403 U.S. at 619, 91 S.Ct. at 2114 (emphasis supplied), reliance could not be placed simply "on the good faith and professionalism of the secular teachers and counselors functioning in church-related schools", Meek, 421 U.S. at 369, 95 S.Ct. at 1765. Accordingly, there must be the active and extensive surveillance which the City has provided, and, under Meek, this very surveillance constitutes excessive entanglement even if it has succeeded in preventing the fostering of religion.
 
 
 59
 Second, in resisting the charge that Title I has led, or may lead, to a fostering of religion, the appellees' arguments too often invoke "mosts" and averages. Thus, we are told that there is little risk because 78% of all Title I teachers and other professionals spent less than five days a week in the same public school and worked in more than one. From the perspective of the Establishment Clause, however, it is more important that 22% did work five days a week in the same school, thereby becoming regular components of the religious school's teaching complement, with the special vulnerability to religious influence that this entails. We are likewise unmoved by the statistic that children in 180 of the 231 nonpublic schools receiving Title I services got them from itinerant teachers or professionals. The more significant statistic is that children in 51 nonpublic schools received remedial instruction from public school teachers who were regularly in such schools. Similarly, the fact that a large majority of the public school teachers and other professionals work in nonpublic schools with religious affiliations different from their own does not avoid the conclusion that many of them work--some five days a week--in schools having the same religious affiliation, with consequent enhancement of the danger that the religious atmosphere of the school will penetrate into the remedial instruction or other services.[19]
 
 
 60
 Third, the whole basis of appellees' argument, namely, that no harm has been proved to have been done in the past is a fundamentally wrong approach to the problem of public aid to religious schools. There is no guarantee that what seems to have been an enlightened approach by the City and the Board to the administration of its plan for sending public school personnel into religious schools will continue. Yet taxpayers like these plaintiffs, who are interested in the preservation of the Establishment Clause and on whom and whose organizations the burden of enforcement in cases like these largely rests, cannot reasonably be expected to mount perpetual guard. In our view, the Court has been wise in relying upon its reasoned apprehension of potentials rather than sanctioning case-by-case determinations of the precise level of risk of fostering religion, since such an empirical approach would inevitably lead to increased litigation in an area where some degree of certainty is needed to prevent constant controversy. Justice Blackmun may have been unduly sanguine when he stated in Roemer, supra, 426 U.S. at 754, 96 S.Ct. at 2348, that "there is little room for further refinement of the principles governing public aid to church-affiliated public schools." But there could be no greater step away from the goal of reasonable certainty than to adopt a rule that the validity of a program should hinge on its precise workings from year to year.
 
 
 61
 Fourth, any breach of the principle of Meek that the line is to be drawn at sending public school teachers and other professionals into religious schools could have consequences going far beyond the program at issue here. We see no principled basis for limiting the position urged by appellees to remedial instruction or clinical and guidance services. One can readily think of other subjects--ranging from chemistry, physics, and mathematics to physical education and arts and crafts--where it would be easy to devise courses as free of any obvious religious features as the types of instruction here involved, and whose delegation to public school teachers would not significantly affect the religious mission of the schools in the areas which they reserved for their own teachers.[20] The pressure to exploit this possibility would be immense. Apart from political considerations, the Court has long recognized that a combination of the understandable feelings of parents who are taxed to support the public schools, yet are forced by their religious convictions also to pay to send their children to religious schools, cf. Lemon, 403 U.S. at 622, 91 S.Ct. at 2115, and the fear of increased burden on the fisc if the religious schools should close, cf. Nyquist, 413 U.S. at 797, 93 S.Ct. at 2977, would produce unremitting efforts to exploit any hole that had been opened. To relax Meek 's ban on sending public school teachers and counselors into religious schools, a ban later recognized in Roemer and Wolman, on the basis of a demonstration that this has not advanced religion in the New York City schools, would let the genie out of the bottle.[21] Considerable segments of the curriculum of the religious schools could be turned over to public school teachers, working in classrooms denuded of religious symbols and with "state inspectors prowling the halls of parochial schools and auditing classroom instruction," Lemon v. Kurtzman, 403 U.S. at 650, 91 S.Ct. at 2129 (opinion of Brennan, J.). It will not do to say that such an outcome cannot occur "while this Court sits", Panhandle Oil Co. v. Mississippi ex rel. Knox, 277 U.S. 218, 223, 48 S.Ct. 451, 453, 72 L.Ed. 857 (1928) (Holmes, J., dissenting), unless there is a principled basis on which the Court can impose a limit. The Court has thus wisely decided, as we read its cases, that whatever the situation may be with respect to other forms of government aid, no part of the teaching or counseling function in parochial schools can be performed by public school employees, whether under a good plan, a bad plan, or no plan at all.
 
 
 62
 Fifth, appellees' arguments ignore the symbolic significance of the regular appearance of public school teachers in religious schools. More than twenty years ago, the Court elucidated the "neutrality" test toward religion as stemming "from a recognition of the teachings of history that powerful sects or groups might bring about a fusion of governmental and religious functions or a concert or dependency of one upon the other to the end that official support of the State or Federal Government would be placed behind the tenets of one or of all orthodoxies." Abington School District v. Schempp, 374 U.S. 203, 222, 83 S.Ct. 1560, 1571, 10 L.Ed.2d 844 (1963). Quite recently the Court has said, "the mere appearance of a joint exercise of legislative authority by Church and State provides a significant symbolic benefit to religion in the minds of some by reason of the power conferred." Larkin v. Grendel's Den, Inc., 459 U.S. 116, 103 S.Ct. 505, 74 L.Ed.2d 297, 306 (1982). Under the City's plan public school teachers are, so far as appearance is concerned, a regular adjunct of the religious school. They pace the same halls, use classrooms in the same building, teach the same students, and confer with the teachers hired by the religious schools, many of them members of religious orders. The religious school appears to the public as a joint enterprise staffed with some teachers paid by its religious sponsor and others by the public. Although the degree of public participation may thus far be minor, the potential for expansion is there.
 
 
 63
 3) Appellees' argument that the City's religious schools are not predominantly religious
 
 
 64
 Another distinction sought to be drawn by appellees is that the religious schools here in question are not of the same sort as those in Meek. In order to prevail on the entanglement issue on this basis, appellees would have to sustain the position that the schools are so nearly secular that significant surveillance is not required. No such position can be sustained.
 
 
 65
 The argument takes off from the fact that the complaint in Meek alleged that the schools there in question were of the sort described in the margin.[22] It is then urged, on the basis of affidavits of the Reverend Monsignor John J. Healy, Secretary of Education and Director of the Department of Education of the Roman Catholic Archdiocese of New York, the Reverend Vincent D. Breen, Superintendent of Education of the Roman Catholic Diocese of Brooklyn, the principals of two Hebrew day schools, and 42 public school teachers and other professionals working in parochial schools, that the schools here in question do not have all these characteristics. In effect appellees argue that all the religious schools here in question are like the four colleges in Roemer, supra note 13. The effort fails on both the facts and the law.
 
 
 66
 With respect to the facts, we take the affidavit of Monsignor Healy as making the most complete statement of appellees' position. Although the affidavit is persuasive that many, perhaps most, of the schools in the Archdiocese of New York receiving Title I assistance do not exhibit all the characteristics listed in the Meek complaint, a careful reading discloses that many of the schools have many of the characteristics and some may have all. Indeed, the picture that emerges is of a system in which religious considerations play a key role in the selection of students and teachers, and which has as its substantial purpose the inculcation of religious values.[23]
 
 
 67
 As for the law, Meek v. Pittenger did not rest on a finding that the Pennsylvania religious schools possessed all the characteristics alleged in the complaint. The divided three-judge court held the Pennsylvania programs to be valid even if all these allegations were true and therefore made no findings whether they were or not. The portion of Justice Stewart's opinion holding unconstitutional the provision in Act 195 for the loan of instructional materials and equipment referred to the "predominant[ly] sectarian character" of the nonpublic schools, "the primary, religion-oriented educational function of the sectarian school[s]", and "the predominantly religious role performed by many of Pennsylvania's church-related elementary and secondary schools", 421 U.S. at 364-65, 95 S.Ct. at 1762-63 (emphasis supplied). He also observed that "[t]he very purpose of many of those schools is to provide an integrated secular and religious education; the teaching process is, to a large extent, devoted to the inculcation of religious values and belief", 421 U.S. at 366, 95 S.Ct. at 1763, and quoted with approval Justice Brennan's statement in Lemon, 403 U.S. at 616-17, 91 S.Ct. at 2112-2113 (concurring opinion), that "the secular education those schools provide goes hand in hand with the religious mission that is the only reason for the schools' existence." A fair case could therefore be made, on the record before us, that government funding of the City's Title I program constitutes a direct and substantial advancement of religious activity under the portion of Meek dealing with the loan of instructional materials and supplies.
 
 
 68
 However, as stated above, we need not go so far. When the Court struck down Act 194, relating to state provision of "auxiliary services", it relied on entanglement grounds. What mattered, therefore, was the risk that public employees would consciously or unconsciously foster religion, and the entangling prophylaxis that efforts to prevent this would entail. Hence it was enough that the teachers and other professionals employed under Act 194 were "performing educational services in schools in which education is an integral part of the dominant sectarian mission and in which an atmosphere dedicated to the advancement of religious belief is constantly maintained." 421 U.S. at 371, 95 S.Ct. at 1766. The facts (as opposed to the conclusions) presented in the affidavits offered by appellees bring the religious schools here at issue well within this characterization. It may be that the degree of sectarianism in Catholic schools in, for example, black neighborhoods, with considerable proportions of non-Catholic pupils and teachers, is relatively low; by the same token, in other schools it may be relatively high. Yet, as previously said, enforcement of the Establishment Clause does not rest on means or medians. If any significant number of the Title I schools create the risks described in Meek, Meek applies. It would be simply incredible, and the affidavits do not aver, that all, or almost all, New York City's parochial schools receiving Title I aid have, in Justice Brennan's words in Lemon, supra, abandoned "the religious mission that is the only reason for the schools' existence."
 
 
 69
 Beyond this, the kind of inquiry suggested by appellees is neither possible nor permissible. There is no indication that the City has ever made any inquiry into the precise degree of religiosity of each of the religious schools into which Title I personnel are sent and it would be expecting altogether too much of these six plaintiffs or their counterparts in a subsequent case to do so. Furthermore, conditions change. One archbishop of New York or bishop of Brooklyn may be content to maintain an atmosphere only moderately dedicated to the advancement of religious belief; his successor may require more. For the City to maintain a constant watch on the religious content of the schools would constitute another aspect of the "entanglement" which the Establishment Clause forbids.
 
 
 70
 We recognize that the picture of the schools' secular character painted in the affidavits bears some resemblance to that of the religiously affiliated colleges that figured in Roemer v. Maryland Public Works Board, supra note 13, 426 U.S. 736, 755-56, 96 S.Ct. 2337, 2349, 49 L.Ed.2d 179. The similarity, however, is far from complete, as a comparison with the schools described by Monsignor Healy makes clear. Although the Court held that they were not "pervasively sectarian" for purpose of Lemon's "primary effect" test, none of the four colleges in Roemer received funds from or made reports to the Catholic church; here some of the Catholic schools do receive such funds and all are under the supervision of the diocese. In Roemer attendance at Catholic religious exercises was not required; here it is. In Roemer there was no "actual college policy" of beginning the classes with prayer; here there is a uniform practice of beginning or ending the school day or a particular class with prayer. In Roemer the student bodies were "chosen without regard to religion"; here Catholics are preferred. Still more important are the differentiating factors with respect to entanglement. Here, as in Lemon but not in Roemer, we are dealing with elementary and secondary schooling; the aided schools are under the general supervision of the Roman Catholic diocese; and each school has a local Catholic parish that assumes ultimate financial responsibility for it. According to the Roemer Court, these and other factors make "impossible what is crucial to nonentangling aid programs: the ability of the State to identify and subsidize separate secular functions carried out at the school, without on-the-site inspections being necessary to prevent diversion of the funds to sectarian purposes", 426 U.S. at 765, 96 S.Ct. at 2353. See also Tilton v. Richardson, supra, 403 U.S. 672, 687, 91 S.Ct. 2091, 2100, 29 L.Ed.2d 790 (finding only "minimal", nonentangling surveillance necessary in case of sectarian colleges which did not have religious indoctrination as their substantial purpose).
 
 4) Other arguments
 
 71
 Finally we shall deal briefly with other arguments made by appellees, although the short answer to all of them is that they bear on the question of "primary effect", not on the entanglement issue which was central to the Court's decision in Meek and to our decision here.
 
 
 72
 Referring to the mention in many Supreme Court cases of a statute's benefitting a broad class of persons, appellees emphasize that the aid here in question is offered not simply to religious schools but to all schools and to many pupils, the great majority of them in the public schools. But in Meek, too, the plan in question benefitted a broad class of persons. As previously pointed out, Act 194 provided auxiliary services in nonpublic elementary and secondary schools, which services were to be of the same nature as those provided in the public schools. In any event, it cannot be of constitutional significance whether the state provides services in private schools to cover a type of expense already met in the general program of the public schools or, as under Title I, provides services in both public and nonpublic schools.[24]
 
 
 73
 A second argument is that the Title I program affords aid to the children rather than the schools. This is subject to three answers, any one of them sufficient. The first is that the same argument could have been made in Meek. The second is that the aid here, to wit, the provision of teachers and other professionals, is furnished to the school on its application, although the ultimate beneficiary may be the student. The third is what the Court said in Nyquist, supra, 413 U.S. at 785-86, 93 S.Ct. at 2971-72, and in Wolman, supra, 433 U.S. at 250, 97 S.Ct. at 2606.
 
 
 74
 Finally, appellees, particularly relying on the recent decision in Lynch v. Donnelly, --- U.S. ----, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984), argue that Title I involves no unconstitutional advancement of religion because the Government's assuming the burden of remedial instruction in religious schools is only "indirect", "remote" or "incidental" advancement. But this argument again ignores that Meek did not rely on the second prong of the Lemon test, to wit, benefit to religion, but on the third, excessive entanglement.
 
 CONCLUSION
 
 75
 As said by then District Judge Higginbotham, dissenting from the portion of the decision of the three-judge court in Meek v. Pittenger, supra, 374 F.Supp. 639, 663, which affirmed the constitutionality of Pennsylvania's provision of auxiliary services in religious schools, "there is a tugging appeal to one's humanitarian feelings and interest over the difficulties which will confront nonpublic schools" if New York City's long-standing plan for implementing Title I by sending remedial teachers and counselors into religious schools is invalidated. These schools may well be unwilling or unable to pay for such auxiliary services with their own resources. While other ways of using Title I funds for the benefit of students in religious schools can be found, these, as shown in Wolman, are almost certain to be less effective, more costly, or both. This is a hard case, and hard cases, like great cases, as Justice Holmes reminded us in Northern Securities Company v. United States, 193 U.S. 197, 400-01, 24 S.Ct. 436, 486-87, 48 L.Ed. 679 (1904) (dissenting opinion), can make bad law. We fully understand and appreciate why the three-judge court in PEARL and the district judge here struggled to find constitutional justification for a program that apparently has done so much good and little, if any, detectable harm.
 
 
 76
 However, efficiency was not the objective of the framers of the Bill of Rights; they aimed to restrain government from certain acts which legislative majorities had determined to be wise. See Stanley v. Illinois, 405 U.S. 645, 656, 92 S.Ct. 1208, 1215, 31 L.Ed.2d 551 (1972) ("But the Constitution recognizes higher values than speed and efficiency."). Our task here, while difficult, is easier than was Judge Higginbotham's. He wrote before the Supreme Court had decided Meek; we write thereafter. As we have repeatedly said, nothing in this extensive record shows that the surveillance under New York City's plan is significantly different from that contemplated by the Meek Court, and we must reiterate that this portion of Meek was decided on the ground of entanglement, not aid to religion. We cannot escape the conviction that, despite the attempted distinctions, appellees are really asking us to say that Meek was wrongly decided--that the majority, although expressly addressing the issue, see 421 U.S. at 371, 95 S.Ct. at 1766, did not adequately appreciate the difference between the surveillance of religious school teachers condemned in Lemon and the surveillance of public school teachers in religious schools condemned in Meek. Whatever the merits of that argument may or may not be, we are nevertheless bound by the Meek decision, see Hutto v. Davis, 454 U.S. 370, 375, 102 S.Ct. 703, 706, 70 L.Ed.2d 556 (1982). Moreover, we have identified some considerations beyond those discussed in Meek which seem to us to call for its result.[25]
 
 
 77
 We therefore reverse the order of the district court granting summary judgment to appellees and direct it to enter judgment granting appellants' cross-motion for a judgment declaring that New York City's plan violates the Establishment Clause and an appropriate injunction. The district court should afford sufficient time for the City to propose and the Secretary to approve an alternative plan. For our part we shall stay the issuance of the mandate until thirty days after the final disposition of any timely petition for rehearing or suggestion for rehearing en banc, in order to enable appellees, if they remain aggrieved, to petition the Supreme Court for certiorari (or, if they should consider this appropriate, to appeal under 28 U.S.C. Sec. 1252), and, if such a petition be filed and/or such an appeal be taken, until the final disposition thereof.
 
 
 
 [1]
 Effective October 1, 1982, Title I was superseded by Chapter 1 of the Education Consolidation and Improvement Act of 1981, 20 U.S.C. Sec. 3801 et seq., which incorporates by reference many sections of former Title I and includes virtually identical provisions governing the participation of nonpublic school students. The decision below and the parties before us uniformly refer to Title I and the regulations issued thereunder, see 45 C.F.R. Part 116a (1979), and for clarity's sake we shall do likewise
 
 
 [2]
 If we were to look only at the language of the statute, we would not be altogether sure that a program sending public school teachers into religious schools was authorized. The examples given, to wit, dual enrollment, educational radio and television, and mobile educational services and equipment, would indicate that Congress was sensitive to the serious Establishment Clause questions that would be posed by sending public school teachers into a religious school and wished to avoid them. Consistently with such an intention, the equality requirement goes only to the amounts expended and not to the manner of expenditure. A construction that sending public school teachers into parochial schools was not intended would also have been supported by the canon of construing so as to avoid serious constitutional doubts, see, e.g., Richmond Screw Anchor Co. v. United States, 275 U.S. 331, 346, 48 S.Ct. 194, 198, 72 L.Ed. 303 (1928). However, drawing on a statement in the Senate report, S.Rep. No. 146, 89th Cong., 1st Sess. 12 (1965), U.S.Code Cong. & Admin.News 1965, 1446, and remarks of two Congressmen, the Supreme Court said with respect to Title I in Wheeler v. Barrera, 417 U.S. 402, 422-23 & n. 18, 94 S.Ct. 2274, 2285-2286 & n. 18, 41 L.Ed.2d 159 (1974) (footnote omitted), that
 [i]t was anticipated, to be sure, that one of the options open to the local agency in designing a suitable program for private school children was the provision of on-the-premises instruction, and on remand this is an option open to these petitioners and the local agency.
 This language, as shown by n. 18, was a paraphrase of the Senate Report, not a holding of constitutionality.
 
 
 [3]
 For the 1981-82 school year, 561 of more than 900 public school attendance areas were so identified
 
 
 [4]
 This provides:
 Neither the state nor any subdivision thereof shall use its property or credit or any public money, or authorize or permit either to be used, directly or indirectly, in aid or maintenance, other than for examination or inspection, of any school or institution of learning wholly or in part under the control or direction of any religious denomination, or in which any denominational tenet or doctrine is taught, but the legislature may provide for the transportation of children to and from any school or institution of learning.
 
 
 [5]
 As stated in defendants' Rule 9(g) statement, p 49:
 (a) The remedial reading program is designed to supplement the students' regular reading program and to raise the achievement levels of students in grades one through twelve who are reading one or more years below their grade level.
 (b) The reading skills center program provides more intensive remedial reading instruction for students in grades four through eight whose reading achievement levels are as much as five years below grade level.
 (c) The remedial mathematics program offers remedial instruction to students in grades one through twelve whose scores on standardized tests show them to be six months or more below grade level in mathematics.
 (d) The English as a second language program is designed primarily for very young children or students who have recently arrived in the United States. That program provides basic instruction in the English language, with emphasis on oral proficiency, to enable the students to achieve the competency and fluency in the English language which is necessary for them to participate effectively in regular instructional programs.
 
 
 [6]
 The decision in regard to the Pennsylvania statute led inexorably to summary affirmance in Sanders v. Johnson, 403 U.S. 955, 91 S.Ct. 2292, 29 L.Ed.2d 865 (1971), aff'g 319 F.Supp. 421 (D.Conn.1970), where the district court had invalidated a similar Connecticut statute
 
 
 [7]
 Justices Black and Harlan, the former of whom had dissented and the latter of whom had concurred in Tilton, had been succeeded by Justices Powell and Rehnquist, both of whom joined the majority in Hunt. Justices Douglas, Brennan and Marshall dissented in both cases
 
 
 [8]
 We pass over the denial of certiorari, 409 U.S. 921, 93 S.Ct. 220, 34 L.Ed.2d 182 (1972), in Nebraska State Board of Education v. School District of Hartington, 188 Neb. 1, 195 N.W.2d 161 (1972), in what might have been the Court's first encounter with the use of Title I funds in connection with a parochial school. Justice Douglas, joined by Justice Marshall, dissented from the denial of certiorari. Justice Brennan, who joined in denying the petition, filed an opinion pointing out the special facts involved. There were no available classrooms in the public schools but two were available in a parochial school. The school district proposed to lease these classrooms for instruction by public school teachers of both public and parochial school students. "Thus, the school district would have no part whatever in the curriculum of the parochial school either by way of subsidy of its costs through financing of teaching or otherwise." 409 U.S. at 926, 93 S.Ct. at 222. That Justice Brennan did not consider his Hartington opinion as sanctioning the sending of public school teachers into parochial schools to give remedial instruction to pupils in those schools is made evident by his later opinions in Meek and Wolman, infra. The view of the three-judge court, 489 F.Supp. at 1264, that Justice Brennan's remarks in Hartington "are particularly relevant to the case at bar" affords some measure of the difference in our reading of the precedents
 
 
 [9]
 Justice Powell, joining the Court's opinion, observed, 417 U.S. at 428, 94 S.Ct. at 2288:
 I would have serious misgivings about the constitutionality of a statute that required the utilization of public school teachers in sectarian schools. See Committee for Public Education v. Nyquist, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973).
 Justice White, also concurring, said, 417 U.S. at 429, 94 S.Ct. at 2289, that he was
 pleasantly surprised by what appears to be a suggestion that federal funds may in some respects be used to finance nonsectarian instruction of students in private elementary and secondary schools.
 Justice Douglas, dissenting, id., thought the Court should have decided that none of the proposed forms of aid to parochial schools was constitutional.
 
 
 [10]
 The Chief Justice, Justice White and Justice Rehnquist would have noted probable jurisdiction and set the case for oral argument
 
 
 [11]
 As shown by their votes in Lemon, supra, 413 U.S. 825, 93 S.Ct. 2982, 37 L.Ed.2d 939 Justice Brennan and his two colleagues would have placed the Part V result of unconstitutionality on broader grounds
 
 
 [12]
 Meek cannot be distinguished on the basis that the Pennsylvania statute provided auxiliary services only in nonpublic schools--a form of discrimination which all the Justices would surely have stricken down without saying more. The purpose of Act 194 was to provide children in nonpublic schools benefits similar to those already afforded in public schools, see 421 U.S. at 352 n. 2, 95 S.Ct. at 1756 n. 2
 
 
 [13]
 Just as Lemon was to have its Tilton, Nyquist and Meek were to have Roemer v. Board of Public Works, 426 U.S. 736, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976). The Court there sustained a Maryland program of grants to private institutions of higher learning for each full-time student (excluding students enrolled in seminarian or theological academic programs) in an amount equal to 15% of the State's per-full-time-pupil appropriations for students in the state college system. The grant could be used for any purpose except that, as provided by an amendment to the statute, none of the money could be utilized for sectarian purposes. Justice Blackmun, writing for himself, the Chief Justice and Justice Powell, thought that Lemon 's primary effect test was met by the district court's finding that the four colleges at issue were not "pervasively sectarian", 387 F.Supp. at 1293. This, in turn, was based on a number of subsidiary findings, summarized at 426 U.S. 755-58, 96 S.Ct. at 2349-50 which he declined to characterize as clearly erroneous. 426 U.S. at 758, 96 S.Ct. at 2350. He expected that in using the grant the colleges "will give a wide berth to 'specifically religious activity,' and thus minimize constitutional questions" regarding the advancement of religion. 426 U.S. at 760-61, 96 S.Ct. at 2351. (footnote omitted). Justice Blackmun had more difficulty with the entanglement hurdle. He surmounted this on three bases set forth at 426 U.S. 762-66, 96 S.Ct. 2352-54. What he found "most impressive"in distinguishing Lemon was the following, 426 U.S. at 764-65, 96 S.Ct. at 2353
 The elementary and secondary schooling in Lemon I came at an impressionable age; the aided schools were "under the general supervision" of the Roman Catholic diocese; each school had a local Catholic parish that assumed "ultimate financial responsibility" for it; the principals of the schools were usually appointed by church authorities; religion "pervade[d] the school system"; teachers were specifically instructed by the "Handbook of School Regulations" that " '[r]eligious formation is not confined to formal courses; nor is it restricted to a single subject area.' " 403 U.S., at 617-618, 91 S.Ct. at 2113. These things made impossible what is crucial to a nonentangling aid program: the ability of the State to identify and subsidize separate secular functions carried out at the school, without on-the-site inspections being necessary to prevent diversion of the funds to sectarian purposes.
 Justices White and Rehnquist furnished the majority by reiterating and amplifying the views expressed in the former's dissent in Lemon and the latter's dissent in Meek. Justices Brennan and Marshall dissented on the grounds set forth in the former's separate opinion in Lemon. Justice Stewart's dissent made particular point of the fact that theology courses were a compulsory part of the curriculum and that the findings of the district court with respect to the nature of the instruction in those courses differed radically from those in Tilton, and the noncategorical nature of the grants; he also agreed with the views of Justices Brennan and Stevens. 426 U.S. at 773-75, 96 S.Ct. at 2357-58. The latter's dissent expressed agreement with Justice Brennan's views; he "would add emphasis to the pernicious tendency of a state subsidy to tempt religious schools to compromise their religious mission without wholly abandoning it." 426 U.S. at 775, 96 S.Ct. at 2358.
 For our purposes the most important thing about Roemer is Justice Blackmun's reaffirmation and explication of Meek. Referring to the portion of that opinion relating to "auxiliary services" ("remedial instruction, counseling and testing, and speech and hearing therapy"), he said, 426 U.S. at 754, 96 S.Ct. at 2348.
 These also were intended to be neutral and nonideological, and in fact were to be provided by public school teachers. Still, there was danger that the teachers, in such a sectarian setting, would allow religion to seep into their instruction. To attempt to prevent this from happening would excessively entangle the State in church affairs. The Court referred again to the danger of political divisiveness, heightened, as it had been in Lemon I and Nyquist, by the necessity of annual legislative reconsideration of the aid appropriation. 421 U.S., at 372, 95 S.Ct. at 1766.
 He added, id.:
 So the slate we write on is anything but clean. Instead, there is little room for further refinement of the principles governing public aid to church-affiliated private schools. Our purpose is not to unsettle those principles, so recently reaffirmed, see Meek v. Pittenger, supra, or to expand them substantially, but merely to insure that they are faithfully applied in this case.
 
 
 [14]
 Justice Powell, concurring in these and other points of Justice Blackmun's opinion, filed a statement recognizing that "[o]ur decisions in this troubling area draw lines that often must seem arbitrary", but adding that any loss of analytical tidiness seemed "entirely tolerable" in view of "the positive contributions of sectarian schools" and what he deemed the lessened dangers of "significant religious or denominational control over our democratic processes--or even of deep political division along religious lines...." He characterized the Court's decisions as having "sought to establish principles that preserve the cherished safeguards of the Establishment Clause without resort to blind absolutism" and thought that "[m]ost of the Court's decision today", including Parts V and VI, "follows in that tradition." 433 U.S. at 262-63, 97 S.Ct. at 2613. We thus cannot subscribe to appellees' contention that Justice Powell was departing from the position he had taken in Meek
 Justice Stevens dissented from portions of the opinion that had sustained various parts of the statute. He expressed preference for abandoning the three-part test of Lemon and returning to Justice Black's shorter formulation in Everson, supra, 330 U.S. at 16, 67 S.Ct. at 511. He conceded, however, that "[t]he State can plainly provide public health services to children attending nonpublic schools", and thought that "[t]he diagnostic and therapeutic services described in Parts V and VI of the Court's opinion may fall into this category". Hence, although having "some misgivings", he was "not prepared to hold this part of the statute invalid on its face." 433 U.S. at 266, 97 S.Ct. at 2615. Of course, the therapeutic services described in Part VI of the opinion were to be furnished only on public premises.
 
 
 [15]
 It is in the nature of ideological influence that it need not always involve the conscious participation of the person influenced. Accordingly, the recognition of the risk that teachers and other professionals will be affected by a sectarian milieu, expressed in Meek and in Wolman, does not presuppose "bad faith" on their part but simply fallibility and the consequent need for constant monitoring with its attendant entanglement. The statement in Committee for Public Education & Religious Liberty v. Regan, supra, 444 U.S. at 660-61, 100 S.Ct. at 849-50, that the Court was unprepared to presume bad faith in order to find excessive entanglement therefore does not aid appellees. Moreover, the Court's statement of entanglement in Regan was in the context of a reimbursement program which it characterized as "straightforward and susceptible to ... routinization", id.--a phrase that hardly describes the roles of teachers and other professionals under Title I
 
 
 [16]
 The majority of the three-judge district court in Meek stated that, "[s]ignificantly, in no educational expenditure case decided on entanglement grounds has the Court ruled that the statute in question was facially unconstitutional ...", and that "a decision on the entanglement criterion will in most if not all cases require a factual inquiry rather than a resort to examination of the face of the statute in issue or to judicial notice about how it may be expected to operate." 374 F.Supp. 639, 650-51 (E.D.Pa.1974). The Supreme Court, however, belied the district court's expectations. As stated by Justice Stewart, Pennsylvania's Act 194 was invalid because the state, "to be certain that auxiliary teachers remain religiously neutral, as the Constitution demands, ... would have to impose limitations on the activities of auxiliary personnel and then engage in some form of continuing surveillance to ensure that these restrictions were being followed." 421 U.S. at 372, 95 S.Ct. at 1766 (emphasis supplied; footnote omitted). This also answers the argument of the district judge in this case that the precedential weight of Meek is limited by the fact that the Court there struck down Act 194 soon after enactment, without a record concerning its actual operations like the extensive one here assembled. When the Court invalidates a program on account of "facial" unconstitutionality, as it in effect did in Meek, its decision rests on "the conclusion that the statute [can] never be applied in a valid manner", City Council of Los Angeles v. Taxpayers for Vincent, --- U.S. ----, ----, 104 S.Ct. 2118, 2124-25, 80 L.Ed.2d 772 (1984) (emphasis supplied). The Meek Court was aware that programs having safeguards like the City's could be devised and might prove sufficient to prevent teachers and counselors from fostering religion; indeed the possibility of such programs had been suggested by Judge Gibbons writing for the majority of the three-judge court, see 374 F.Supp. at 657. The defect which the Court found fatal in Meek was not that Pennsylvania had not imposed supervision and other safeguards like New York City's, but that it would have to do precisely that and would thereby violate the entanglement principle
 
 
 [17]
 In fact there can be no assurance that this is always done; at least when a room has not been permanently reserved for the public school teacher, there is always the possibility of a slip
 
 
 [18]
 Plaintiffs-appellants point out that one of the evaluations of the City's plan said that "[a] team approach was used" in the discussion of individual cases. Joint Appendix at 274
 
 
 [19]
 It was doubtless for this reason that, as we read Meek, the Court renounced the possible distinction suggested but not endorsed in Wheeler, supra, 417 U.S. at 426, 94 S.Ct. at 2285, between a case in which "a former parochial school teacher is paid with Title I funds to teach full time in a parochial school" and one in which "a public school teacher, solely under public control, is sent into a parochial school to teach special remedial courses a few hours a week." A large program will undoubtedly include teachers of both types
 
 
 [20]
 We also see no principled basis for limitation in the facts that the programs here at issue are aimed at poor students and are available only when the school does not offer them--the latter of which any school could readily overcome. But even if such limitations had a principled basis under the Establishment Clause that we do not perceive, the potential for expansion would still be great
 
 
 [21]
 Compare, in this connection, the "Shared Time" program described in Americans United for Separation of Church & State v. School District of Grand Rapids, 718 F.2d 1389 (6 Cir.1983). Under Grand Rapids' program, the public school district leased classroom space in parochial schools for the purpose of offering courses from its general curriculum to nonpublic school students during regular school hours. Course titles included "Humanities, Language Arts, Home Economics, Science, Spanish, French, Latin, Business, Social Studies, Yearbook, Calculus, Creative Writing, Psychology, Journalism, Criminology, and Advanced Biology." 718 F.2d at 1392. The Sixth Circuit invalidated the program as violating the Establishment Clause; the Supreme Court has granted certiorari, --- U.S. ----, 104 S.Ct. 1412, 79 L.Ed.2d 739 (1984)
 
 
 [22]
 [S]chools which (1) are controlled by churches or religious organizations, (2) have as their purpose the teaching, propagation and promotion of a particular religious faith, (3) conduct their operations, curriculums and programs to fulfill that purpose, (4) impose religious restrictions on admissions, (5) require attendance at instruction in theology and religious doctrine, (6) require attendance at participation in religious worship, (7) are an integral part of the religious mission of the sponsoring church, (8) have as a substantial or dominant purpose the inculcation of religious values, (9) impose religious restrictions on faculty appointments, and (10) impose religious restrictions on what the faculty may teach
 421 U.S. at 356, 95 S.Ct. at 1758. See also the rather similar list in the opinion of the three-judge court quoted in Nyquist, supra, 413 U.S. at 767-68, 93 S.Ct. at 2962-63.
 
 
 [23]
 While Monsignor Healy denied that the Title I Catholic and elementary schools in the Archdiocese impose religious restrictions on admissions, he conceded that in 41 schools receiving funds from the Archdiocesan Commission for Inter-Parish Financing, 90% of which are Title I schools, 84% of the students are Catholic. No claim was made that this simply reflected the religious proportion of the neighborhood. It reflected two other factors as well: the desires of Catholic parents and the preference in admissions given to their children. Similarly, although teachers are not restricted to Catholics, the most that Monsignor Healy could say by way of quantification was that "an inquiry of a random sample of Title I schools revealed that 15 non-Catholics were teaching in the schools contacted" out of an unstated number of total teaching positions, and that this was not the total number of non-Catholic teachers. Monsignor Healy also stated that 20% of a total of 359 lay teachers (no figures were given as to the non-lay teachers, who are members of religious orders) employed by Archdiocesan high schools are not Catholic. These figures show exactly what would be expected--that the regular teachers are overwhelmingly Catholics
 Monsignor Healy conceded that "[a] concern for religion and religious values has always been central to the Catholic philosophy of education" and that "the concern for religion and religious values ... is central to the philosophy of Catholic schools", although he maintained that this "in no way dilutes or distorts the content of what would be considered secular, as opposed to religious education courses." The religious education in the schools "reflects a concern that students receive, in their normal educational setting, an exposure to the teachings of the Roman Catholic Church and Christianity in general," although it was asserted that none of the schools "compel[s]" its students to believe anything. Noting that the New York Catholic schools in Nyquist and Levitt, which, after all, included the very ones here involved, were said to have "as a substantial purpose the inculcation of religious values", Nyquist, 413 U.S. at 768, 93 S.Ct. at 2963, he objected to the connotation in the word "inculcate", which, in his view, suggested "an effort to induce students to accept ideas or values through coercion". He admitted, however, that "[o]ur schools have as a central concern that students be aware of Catholic values", although he added that students were intended to "examine these values critically." "The emphasis in the religious education classes in the overwhelming majority of the schools ... is on the teachings of Christianity as the Roman Catholic Church formulates them," although "[n]o effort is made in the religious education courses ... to compel any student to accept as valid or to adhere to the beliefs of the Roman Catholic Church" (emphasis supplied). The Archdiocesan schools require the attendance of pupils at "religious activities." These typically consist of a prayer at the beginning or end of the school day, but, "[i]n addition, during regular school hours on an occasional basis most schools will schedule more formal liturgical observances, such as attendance at Mass by a class or the entire school." While we thus accept Monsignor Healy's statement that the schools of the Archdiosese do not "compel obedience to the doctrines and dogmas of the Roman Catholic Church" or otherwise "seek to coerce the conscience", this is by no means inconsistent with their having as their substantial purpose the "inculcation" of religious values, see Nyquist, supra, 413 U.S. at 768, 93 S.Ct. at 2963. To say that the schools "inculcate" such values is only to say that they earnestly seek to instill or implant them--which need not imply coercion. Cf. Webster's New International Dictionary 1261 (2d ed. 1959) (inculcate: "[t]o teach and impress by frequent repetitions or admonitions"). The fact that New York's Catholic schools do not try to compel students to espouse a particular creed hardly removes them from the class of institutions maintaining "an atmosphere dedicated to the advancement of religious belief", Meek v. Pittenger, supra, 421 U.S. at 371, 95 S.Ct. at 1766.
 
 
 [24]
 Appellees argue that the difference may be of constitutional significance in one respect, namely, the political divisiveness point first adumbrated by the Chief Justice in Lemon. Whereas in Meek there would be an annual battle over Pennsylvania's aiding the religious schools, here the aid is a small part of the aid afforded by Title I to both public and nonpublic schools throughout the United States, which in turn is a small part of the budget of the Department of Education. However, as we read Meek, the political strife argument was simply an additional consideration to bolster a conclusion already reached on other grounds, see 421 U.S. at 372, 95 S.Ct. at 1766. Cf. Mueller v. Allen, --- U.S. ----, ---- n. 11, 103 S.Ct. 3062, 3071 n. 11, 77 L.Ed.2d 721, 733 n. 11 (1983) (indicating political entanglement test is "confined to cases where direct financial subsidies are paid to parochial schools or to teachers in parochial schools"); Lynch v. Donnelly, --- U.S. ----, ----, 104 S.Ct. 1355, 1363, 79 L.Ed.2d 604, 52 U.S.L.W. 4317, 4321 (1984) ("This case does not involve a direct subsidy to church-sponsored schools or colleges, or other religious institutions, and hence no inquiry into political divisiveness is even called for....")
 
 
 [25]
 We are not unaware that, as Justice Blackmun avowed in Committee for Public Education & Religious Liberty v. Regan, supra, 444 U.S. at 663-64, 100 S.Ct. at 851-52 (dissenting opinion), there are deep divisions within the Court with respect to issues such as those here presented and, as appellees have strongly suggested to us, that the composition of the Court has changed since Meek. One need not go beyond Meek itself to know that three present members of the Court would vote to affirm the judgment of the district court in this case if the issue of sending public school teachers and other professionals into sectarian schools to give remedial instruction and guidance were arising for the first time. It is not appropriate for us to speculate how these three Justices would vote now that stare decisis is a factor, see Arizona v. Rumsey, --- U.S. ----, ----, 104 S.Ct. 2305, 2311, 81 L.Ed.2d 164 (1984), and cases there cited--and even less so for us to engage in prediction with respect to the others. In the one case known to us where an inferior court has refused to follow a Supreme Court precedent on the basis of prospective nose-counting, Barnette v. West Virginia Board of Education, 47 F.Supp. 251, 253 (S.D.W.Va.1942)--in that instance successfully, see 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943)--the lower court had a solid basis for prediction which we do not. Our task is to analyze the precedents and apply them as best we can. The responsibility for modifying or overruling them, if that is to be done, rests elsewhere